The next matter on our calendar is IWA Forest Industry Pension v. Textron. We'll hear from appellant. Good morning. Good morning. May it please the court. I'm Frederick Fox of the law firm of Kaplan Fox and Kilsheimer on behalf of the lead plaintiff IWA Forest Industry Pension Plan and the class. Your honors, the ruling below granting defendant's motion to dismiss should be reversed. Under second circuit law as recognized by the district court, all reasonable inferences should be given to plaintiffs. Likewise, while in order to plead a false statement, plaintiff is required to plead with particularity facts from which it is plausible to infer fraud. It does not require plaintiffs to plead facts that make fraud more probable than other explanations as this court held in the Laura Lee Financing v. Wells case, 797F3-160, second circuit 2015. But it appears that that is what, that's the standard that was applied by the district court. In analyzing whether it was plausible that defendant's statements regarding inventory were false, the district court found that it could read defendant's statements regarding Textron's inventory in a way that was not false. While plaintiffs disagree, in any event, under second circuit law, plaintiffs have plausibly alleged a false statement and it was error for the court to require plaintiffs to show that their reading was superior to the court's own benign reading. Thereby, as the court held in Laura Lee, imposing a de facto probability requirement at the pleading stage when such a probability requirement does not apply to an analysis of falsity. Counsel, I've read all the statements that you allege were false. I find a few of them may meet the test, but not everything that you claim. I'm particularly interested in those inventory, the older inventory of Arctic Cat. Could you speak to that? Sure, your honor. I would be happy to. On January 31st, 2018, which begins the class period, defendants started to make statements regarding Arctic Cat inventory. And one thing that it said was we saw improved demand in the snow retail channel, allowing dealers to clear older inventory and drive 2018 model sales. Not sales of old inventory from 2015 or 2016 or 2017, but 2018 model sales. Then that continued on April 18th. Defendant Donnelly said there was significant reductions in aged inventory, that both snow and dirt inventory reductions had happened, that there was lower inventory of aged stuff. And as late as January 18th, and here the class ends in October. I'm sorry, as late as July 18th, stated that, quote, a lot of the stuff that was really older inventory has been moved off the dealer's books. And these guys are taking restockings of current year product. Now, all of these statements, counsel, do you argue are untrue? Yes, yes, your honor. We argue they are not true. And the basis for that, your honor, is there are 10 former Textron employees that have given statements and they are referred to in the complaint, they're referred to as confidential informants. And for example, with the inventory issue, in contrast to the statements that inventory was being reduced and moved off dealer books and driving 2018 model sales, in fact, the complaint alleges that aged and dirt inventory did not significantly decline either prior to or during the class period. In fact, in an allegation that the district court said, quote, forms the heart of Lee plaintiff's case, close quote. According to confidential informant two, Arctic Cat had a steady number of 22,000 to 25,000 non-current year vehicles at dealerships from the acquisition of Arctic Cat in 2017 through at least the summer of 2018. And for context, that is a very large overstock equivalent, and this is alleged in the complaint, to roughly 55% of the company's 2017 snow unit sales and 15 to 23% of the third unit sales. So the point is there is a stark contrast between what the defendant said about inventory and what is alleged in the complaint. And the basis of those allegations are statements by former employees who were at the company, they were in different states and different regions, these were not low-level employees, and those allegations directly contrast with what the defendants were saying. So there is a distinct contrast between that. Moreover, defendants made statements regarding the integration and how that was proceeding. And they said that the integration had been successfully integrated, it was behind Textron, and it was substantially completed. However, we were told by these confidential informants that there were significant problems with the integration, and the complaint contains more than 20 paragraphs of critical integration measures that had not been completed. It isn't one of the problems with this part of your argument that what's substantially completed to one person for one purpose is entirely consistent with important things being left undone? Well, thank you for that question, Judge Kaplan. I'm sure, for example, you've heard of punch lists involving construction, where the contractor says it's substantially completed and you can move in and there's no electricity. I mean, I actually had that happen to me. Well, your honor, I think that's an excellent analogy and one that actually came to my mind in preparing for this argument. And if I, for example, had contracted in New York for a contractor in California to build me a home, and I couldn't visit and check on the progress of that home, if I had a phone conversation with that contractor and I said, hey, how is it going? How's my house coming? And he said, well, it's substantially completed. And he further said that, by the way, of the money that you gave me for this project, to do this project, I have spent 90% of that money already. Most of the money I've spent, I would expect, and I think a reasonable person would expect, that there's a roof on the house, that there are walls, there are walls, the windows are in. Guess what? Nobody here said 90% of the money is spent. That's an objectively ascertainable fact. Substantially completed with respect to an integration is not an objectively discernible fact. Your Honor, in the SEC filings beginning in February of 18, at the beginning of the class period, the defendant stated that of the money allocated for the integration of Arctic Cat, the great majority of that money had been spent. Now, the district court, we allege that was false. The district court said, well, in that section of the SEC filing, when they said substantially completed, they were just talking about the money. They weren't talking about whether the dealer network had been integrated and whether the factoring systems had been integrated. So the district court said that was just talking about the money, and you're not alleging they hadn't spent the money. But nevertheless, I think that it actually supports plaintiff's allegation when they say they spent most of the money. I think a reasonable person here, a reasonable investor, would believe that it is substantially completed, and that's what they said in the SEC filing, substantially completed. What is substantially completed? I believe if they're saying in an SEC filing that most of the money allocated for the project has been spent, a reasonable person, reasonable investor, would assume that the integration is near finished. What does near finished mean? Well, it doesn't mean at the end of the class period, it was disclosed that they were more than a year behind in the integration process. So it doesn't mean we're a year behind. In the house analogy, it doesn't mean there's not a roof on the house. If my contractor tells me he spent 90% of the money and it's substantially completed, I would take that to mean that, as your honor said, there may be a punch list involved, there may be switch plates to put on. I think that's what a reasonable person would expect here when they're saying most of the money had been spent. I believe a reasonable investor would take that to mean the integration was largely finished. Your time has expired. You have reserved two minutes for rebuttal. Thank you, your honor. Thank you, counsel. Good morning, counsel. Good morning. May it please the court, Sandra Goldstein from Kirkland & Ellis for appellees. What Mr. Fox, I'll start with the inventory statements. What Mr. Fox did not mention was all of the statements in 2017, a year's worth of statements that were made by Mr. Donnelly that were talking about the fact that it was clear that Arctic Cat had an inventory problem with respect to its pre-acquisition inventory. So even before the acquisition began in January of 17, even before the acquisition, which was in March of 17, Donnelly is talking about the fact that there's a problem. We have to clear out a lot of the older product in the channel. I'm quoting now, older product in the channels. And then in April of 17, he says, most of the negative impact of the acquisition is driven by solving the inventory issue. Same statement, he says, we know we have to go clean up the dealer channel to get this thing on growth trajectory and then generating good profit. In July of 17, he talks about job one, as we talked about, was running programs to try to clear out a lot of the age. Counsel, the statements that he read us were from respectively January 31, 2018, April 18, 2018, and July 18, 2018. This is well past the period where they knew they had a problem when they took over when they bought Arctic Cap. But they kept saying in 2018, that we're doing well, we're getting rid of this old inventory. Specifically, in July 18. A lot of the stuff was older inventory has been moved off. There's the dealers books. That's what he said. And that was probably true. But but but no, Your Honor, they're not debating that the 16 and older was in fact dealt with what they're saying. They're not and they're not debating that the 17 statements related to the 16 and older and what we're saying is that it's clear from the context of the 2017 statements were by the way, in March of 2017. Donnelly said it's going to take a year to deal with this. So still in January of 18. What we're saying is that the context would be clear to any reasonable investor that they're talking about this same older inventory. He's not talking about 2018 inventory in 2018 or 2017. In fact, he's asked in April of 18. For example, he's asked, please update us what one of the analysts can you update us in terms of clearing the channel overstock, the same stuff he had been talking about for over a year. And he's and by the way, he says to know that he's not talking about current, he actually says at the beginning of that answer, we haven't had any sales in January to March for various reasons. But in terms of the inventory reduction, the same inventory reduction he's been talking about for a year, he says, if you look at both dirt and snow, inventory reductions that happened through the course of the year. So we're talking about the, the inventory reductions through the course of the year, he's talking about the older product that you've been talking about. This very same earnings call on April 18 2018. He says, there's pretty significant reductions in that agent inventory. You've got limited inventory of agent stuff. And you've got a lot of exciting new stuff will be on the floor. And the dealers are pretty excited about it. Correct. The age inventory that he's talking about, it's the same age inventory has been talking about for a year. Doesn't that include the 2017 vehicles? It does not include the 2017 vehicles. That's so you're I think you're fighting the complaint, but no, you're not fighting the complaint. Because again, if anything, plaintiffs concede that in those 2017 statements, he's talking about 16 and older vehicles, they don't debate that. And this is just hearkening back, he's being asked these questions. And, and he said, in fact, go to the July one, which I think is perfectly answers. Can you it says, can you talk a little bit about the distribution inventory levels with Arctic cat now that you kind of entered into the winter season talk about current. And he says, I'm afraid I don't have those numbers at my fingertips. I'm not talking about current. But a lot of the older inventory has been moved off the books. And it says last year, meaning 2017. Last year was great in terms of burning down a lot of the inventory. The older inventory, according to the complaint, was sold off the 2016. But you correct me if I'm wrong at any point. 2016 models were sold off as a result of a rebate program, correct? A significant rebate program. That is Yeah, that's that is so they were not really making a whole lot of money off those 2016 models. And I thought that the entire idea of the theory is that you've got these 2016 models that are subject to a rebate, but you also have all of these 2017 models that need to be sold off. Right. And so when you say we're clearing out all this inventory, you're you're leaving, you're saying they're leaving out the 2017 inventory, but that would be something of consequence to investors. Because there are always 2017 vehicles out there. But you're either just it's just not being referred to in these statements, the statements that they are cherry picking. They're not they're just not referring. He's not talking about the 2017 cars. So and frankly, no matter which cars you're talking about, CI2, which Mr. Fox mentioned, so CI2 says that the inventory was reduced along the lines of what Mr. Donnelly says that the inventory was reduced, but then filled back up, filled back up sometime and became problematic. You know, the big problems mid to late 2018. First of all, your honor, that is not there's no specificity to the when is mid to late 2018. Certainly the January and April statements don't fall within mid to late 2018. The July falls within that, but there's no specificity to it. That's on plaintiffs. And by the way, they say CI5 and 10 had all sorts of data on the inventory year by year, model by model, year by year, dealer by dealer. But they don't they don't specify any of that. All we have here is mid to late 2018. And I rather suspect that if they had data that was helpful for them on this point, that just to show that we're not talking about model year 16, that you know, what they're saying, we would have particularly in their second amended complaint, which was a response to our, to our motion to dismiss their amended complaint. So they knew our arguments, they still did not come forth with any specificity to show, you know, which we're talking about. And frankly, if 90% of the age inventory, I guess maybe what you're saying is, what does that mean? But if 90% of the age inventory was consisted of these 2017 models, and 10% consisted of 2016, and earlier models that were then themselves subject to significant rebates, you would say that a statement by a corporate executive, that they are substantially reducing the age inventory, but only really focused on the 2016 models that that that's not a misleading statement. Well, I would your honor, but I would also say that that definitely brings to mind even the way your honor asked that question. There's a puffery argument here to your honor, because there's set aside the puffery argument for a second. You're, you are saying that that is not a misleading statement so that I refer to age inventory. But I, I really that means the few 10% of inventory models, older models, 2016, that are subject to a significant rebate. But if I say we're getting, you know, we're substantially reducing our age inventory. And that excludes 90% of the cars, 2017, 2017 models, that is not misleading. Well, it's not in the context in which the statements are made and asked, because I think she froze. I hope that wasn't my question. Let's go see your, your, your camera and sound are frozen. Perhaps support room deputy can stop the clock at least. Yeah. I'm telling the court from deputy the rate in terms of burning down a lot of the inventory. What? Okay. Are you there? Miss? She's muted. Well, not not by no, the system just shut down. Now that age inventory. So I don't know if I we missed we missed your answer to my question. I think I'm sure it was great. All right. Well, let me let me talk again. Okay, appreciate that. I appreciate that. So I don't know where you lost me. If you lost me at the beginning. The answer, Your Honor is in the context in which you have to look at the context in the context in which the answers, the questions were asked and the answers were given. So he says in July 18, last year was great in terms of burning down a lot of the inventory. That's what he says last year. He's talking about 2017. What I was talking about in 2017. That was great. In April, he says, if you look at both dirt and snow inventory reductions that happened through the course of the year, which was a big focus of ours, that yielded a lot of results and all those other statements that they made. So he's making clear in the context that he's talking about last year, the reductions from last year. I think it's pretty clear in some of the questions that's being asked that that's what they're actually asking about. But in any event, whatever they're asking, that's what he's answering. And again, he starts in he starts in his answers by saying, I'm afraid I don't have my note those numbers at my fingertips. Right. In terms of the car, I interrupt because please. Maybe you're making this more complicated than it is. You're saying in the context of these calls, last year is the calendar year 2017, or the fiscal year, whatever 2017 models were on dealer floors, was not aged inventory, it was current last year. And when he's talking about aged inventory, he's talking about 2016 and earlier. That's the that is the argument, Your Honor. That's exactly right. And I would also say just just lastly, on this point, that in addition to the fact that, you know, there is a puffery argument, which we set forth on papers, that nothing Donnelly said in Q and the Q3 earnings call contradicts what he said in these statements. There's not a when he's talking in Q3 about sort said, there's been a learning experience about how the channel is managed and how discounting is handling. It's almost like discounting begets discounting. He's not saying that there was this gigantic, you know, aged, aged inventory that that that there are 16, 17, 18 vehicles, he's saying there's a lot of discounting going on. And of course, he talks about the fact that there were some some product that was in the pipeline that wasn't ready to go. And that he had talked about in July. So so that was already out there. But there's not there's just, as we say, our papers, it's just a big mismatch here. There's a disconnect between what's being alleged and how a reasonable investor would take the statements that are made. Your time has expired. We'll hear from Mr. Fox, who reserved two minutes for rebuttal. Um, thank you, Your Honors. Ms. Goldstein said that plaintiffs concede that when defendants spoke about inventory, they were speaking about 2015 and 2016 inventory. Plaintiffs do not concede that. And that is actually not at all what the complaint alleges. The complaint alleges that when defendants spoke about inventory, they were talking about all 2016 and 2017. So plaintiffs in no means concede that. And the NCI to Mr. Fox, how how in January, or in April of 2018. In statements referring to last year, and talking about aged inventory, can anyone reasonably construe aged inventory as meaning the items that were on the floor, current year models? How is that aged inventory, except in the same sense, for example, that when you send a bill to a client, and it hasn't been paid by return mail, it is in some sense aged, but nobody would really call it that or understand that. So Your Honor, the complaint alleges that aged inventory at the time the statements were being made, was inventory from 2015 2016. And the model year 2017, which went on sale, you know, in I believe, September of 2017. 2018, I'm sorry, 2018. So all of that inventory, as alleged in the complaint is aged inventory. And the CI is referred to that as the aged you have to consider the context. Nowhere in the context does Donnelly or say at all ever that I am only talking about 2015 or 2016. In fact, the channels were stuffed from the beginning of 17 through the end of the period with more than 22 to 25,000 vehicles and that number did not change. And just just to clarify, did you really mean to say that the 2017 model year did not go on sale till September of 2018? No, Your Honor, if I said that I misspoke it went on sale. The 2018 model year went on sale in September of 2017. And when did in September of 2017? Yes. Thank you, counsel. Your time has expired. Thank you. A very good argument will reserve decision.